Good morning, Your Honors. My name is John Johnson. I'm appearing on behalf of the appellant, Judith Papenburg. You've gotten a real education in Fourth Amendment today, having to wait for your argument. This is different here. I'd like to reserve three minutes for rebuttal here. All right. Please watch the clock, though, because I'll try and help you out. We believe that the issues are whether the administrative law judge made adequate findings and whether he failed to fully and fairly develop the record. The district court noted that both parties agreed that, based upon the medical evidence of appellant's sinus surgery in 1988 that hemorrhaged into her brain, the medical evidence met the disability standards 12.02a for organic brains to no damage. The dispute really centers on the B criteria, severity of functional limitations, and we believe that there are two errors in this regard. The first is that the administrative law judge set forth no explanation for his B part findings. This is an error under the Schneider case. Significantly also, number two, the administrative law judge made no findings whatsoever with regards to her chronic inflammatory sinuses that caused daily headaches at any of the stages, and we contend that he should have made such a finding and then considered, in combination with her mental impairment, her organic brains to no damage and her short-term memory loss in making those B part findings. This is the Lester-Marsha error. Also, the administrative law judge rejected all of the medical evidence from her treating physicians. This is Dr. McKinney, who stated in December of 1993 that she had been apparently suffering from a deterioration in her dementia, and he had referred her, cascading from her sinus surgery, and he referred her to Dr. Burke. And the administrative law judge also rejected the two assessment forms from her internal medicine doctor. This is Dr. Youngs, who also indicated that he thought that her condition was progressively deteriorating. The judge said in both cases that he felt that the medicals did not support their opinions and that they were in conflict with the report devised by a psychologist, Dr. Padel, as well as a neurologist, Dr. Slavin. We have contended, argued, that there was no real conflict because Dr. Padel mentioned that he only considered her limitations from a strictly intellectual point of view, that she still had the capacity to perform simple elemental tasks on a consistent and reliable basis. Dr. Padel did not consider chronic headaches from the inflammation. Dr. Slavin, the neurologist, said that her symptoms were subjective, some memory loss here. Again, he did not consider the chronic headaches. Significantly, at the close of the hearing, the judge says that he was willing to grant the appellant's claim at the date that she turned age 50, which is by operational law and the medical vocational guidelines. He said, if you want something more, if you want me to basically establish eligibility, determine onset date, I need something more. We had a big discussion about this, and I said, all right, Your Honor, I will obtain the results of battery psychological tests, basically the Lurie, Nebraska test for organic brain signal damage, and I'll send her out to a neurologist here. The judge said that was acceptable. I obtained those results. I submitted them to the judge. The judge rejected both of those consultants' reports on the grounds they were not supported by the evidence, but specifically he said that Dr. McDonald's psychological assessment did not indicate any functional limitations or when they may have occurred. As to Dr. Fornes, he says that that was not really his description of inability to perform sustained work activity, was inconsistent with the evidence of records, specifically Dr. Podell's assessment, that says she could work on a reliable and consistent basis here. But help me if I got the sequence of the doctors a little bit better in my mind, for example. McKinney is the first doctor that she saw, and that's the primary care doctor? That's correct, Your Honor. And then he referred her to Dr. Burke. Bruce Burke. Yes. Who would also be a treating doctor, I gather, because he was the one that repaired her. He repaired the damage after the sinus surgery. He didn't do the sinus surgery. After there was the hemorrhage into the brain here, he's the one that basically repaired the damage and tried to follow her condition for a while. So he was treating really in effect also because he was repairing the damage, right? He was really the surgeon that had repaired the damage, and he followed her for a while until he felt that there was basically nothing more that could be done for her. And then when did Dr. Youngs get into the picture? Dr. Youngs has always been her family doctor, and I've been seeing her basically forever and ever. She was at a clinic up in Berry Creek, and he treated her colds and her aches and pains and her arthritis in her back. I thought that was Dr. McKinney. No. Well, Dr. McKinney was one of her treating physicians, Your Honor, but she had several. But the claimant lived up in Berry Creek, and so the closest clinic was actually the Berry Creek Clinic, and that's where Dr. Youngs worked. That's where Dr. Youngs worked. Okay. Yes. And then Dr. Forner and Dr. McDonald were the ones that you later afterwards, after having been suggested by the administrative law judge to have her examined. That was after she was 50, I guess. That was after she turned age 50. That was at the end of the hearing. That was really at that time here. They were just strictly consultants because the judge said he needed something more. And what we're arguing here is that because the ALJ rejected the reports by Dr. McKinney that said she's unemployable, increasing dementia, Dr. Youngs, and the consultants reports, there's a fundamental ambiguity in the case here, which is basically she was found to be disabled as a matter of operation of law rather than based upon the medical evidence here. It still stands that the judge said, as the district pointed out, it could have always been said that she's always been disabled or she's never been disabled. No one really knows when onset date of disability began here. One of the things that's a little unclear to me, I mean, the focus, you're making the focus on the chronic sinusitis as one of your two errors. And as I went through the ALJ's review of the evidence and the second hearing, because there's a second ALJ on this remand, where was the focus in the presentation on your part of the, because I looked at Forner and McDonald, are they focusing on the headaches or are they focusing on something, sort of the effect of the headaches? It's a little unclear to me how the headaches play into it. If somebody says, I've got such a severe headache, I can't work, whether it affects my memory or not, I've got these severe splitting headaches and I can't go to work. Is that the nature of the claim and evidence or is it somehow just sort of morphs into this mental impairment? Really, it goes to the last issue. But, no, Dr. Forner was a neurologist and he just really considered the effects of the organic brain syndrome damage. He didn't really consider headaches at all or the sinusitis. And neither did Dr. McDonald. That was really a specialized test, a learned basket test to determine organic brain syndrome damage, the level of that. It wasn't really to have anything to do with that. What do you say the evidence is on the chronic sinusitis that was there that wasn't properly considered? Well, there was the results of the, I think it was the November 1993 CT scan that said she suffered from encephalomyelitis and brain atrophy and also chronic inflammatory sinusitis. And she was always reporting that she had headaches. There was records from the Orville Hospital that she was reporting headaches all the time. And where we consider this really comes into play here is that the judge, again, made no findings on that, that she had sinusitis, or the effects of that. And when he determined her functional capacity, he said, besides her exertion limitations, that she basically only had one non-exertion limitation and that was a restriction because of her mental impairments, a restriction to the capacity to perform simple, routine, repetitive work. When he presented his hypothetical questions to the vocational expert, he listed only two non-exertion limitations, and that was the inability to use a keyboard, a typewriter, and restriction to being able to perform simple, routine work. Whereas the state agency doctor, Dr. Golub, who also didn't consider the headaches and all that, he said that in addition to a moderate limitation with regards to inability to understand and carry out detailed job instructions, he also said that she was moderately limited in the ability to concentrate on an extended period of time here, and she was also unable to respond appropriately to routine work settings. We contend that there was two errors here, that in the hypothetical questions presented to the vocational expert, who testified that she was able to do two kinds of sedentary jobs, not sorter and surveillance system monitor. First, he did not, the ALJ basically excluded any consideration of pain. It was just not, he did not even focus on that at all here. That is a non-exertion limitation. This court has held in every case that there's evidence of pain, whatever that source might be here, that the pain limitation must be included in the hypothetical to the vocational expert. The testimony is not reliable, cannot constitute substantial evidence. We also contend that VE's testimony was also unreliable because the ALJ did not include those two additional functional limitations in the hypotheticals to the vocational expert. Okay. Why don't you save the rest of your short amount of time. Good morning. My name is Mark Winn, appearing for Kelly, Joanne Barnhart. Substantial evidence does support the ALJ's decision that the claimant was disabled due to age in September 1997, but not before. In response to the headaches, Could I ask a question before we get there because your opponent closed with, what about the exclusion of the limitations caused by pain? The ALJ, in fact, very substantially evaluated credibility in his ALJ decision, and having adequately treated the subjective complaints in that credibility evaluation, he was under no obligation to include those in any assessment of his or her ability to work. The pain was fully addressed in his ALJ decision, and there's no reason to put those in the hypothetical question. Well, where does he fully evaluate that? All he says, I have considered the claimant's allegations of excess pain, and that's all he says. There's no address in this ALJ opinion where he addresses chronic sinusitis and the headaches. We're talking first about the question as to pain? Well, but isn't that supposedly what brought the headaches are the pain, aren't they? Yes, but as far as the symptoms Was there pain from something else, or maybe I'm misreading this? It's pain from any source, in fact. Well, I understand, but in this case, he states that the issue before it, I think I may have had the same question Judge Gibson did. She says she alleged disability due to headaches and a limited short-term memory. That's what he says at page three of his opinion. And then the only thing I can infer that he's addressing with respect to the headaches is the excess pain. Pain was due to headaches. Also, there was an allegation of back pain as well in this case. So where is the detailed analysis that says he's addressed the pain from headaches? Maybe it's there, I just couldn't find it. Yeah, it's the fact that the first dose of conservative treatment, the treatment notes from the doctor. Now, where does the ALJ, are you pointing to the record? Could you show it? Yeah, on page 291 of the transcript, in fact. That would be page eight of his decision. All right. And at least number five first. Well, first, the weight of the objective evidence does not support the claimant's claims of disabling limitations. And as to that, we have the January 18, 1994, Dr. Burke examination, who found essentially normal neurological examination. And what claimant told Dr. Burke at that time was that her headaches were about the same as they were four years prior, which would be 1990. And what's significant is at that time, claimant was, in fact, working rebuilding oxygen regulators, and she continued to work thereafter until 1993. And the district court even said at that point that many persons do have headaches and still are able to continue working. And that's borne out by claimant's actual work activity since those headaches began. Yeah, but it's headaches in combination with a whole lot of other things. And those were all evaluated as well. The main — Those were all what? Those were also evaluated in addition to the headaches as well, in combination. But that's the key, is in combination. It didn't seem like, you know, for example, in the hypothetical, that wasn't illustrated as being one of the things, the vocational expert. Well, claimant's asserting that Dr. Golub, the state agency physician who reviewed the whole record, didn't consider the headaches, but he, in fact, did cite the report of Dr. Burke, who did evaluate the headaches, and said they hadn't changed since four years. What does Dr. Burke say? Dr. Burke says — that's on page 152 of the transcript. And I'm looking just to the paragraph in the middle where, just before the objective, it says, the patient states that her headaches are about the same now as they were four years ago. And this report states — At what time is he examining her? January 1994. So four years prior would be January 1990. And that's the time when, as it says in the beginning, she was working with oxygen regulators. And since that time, she also worked as a home health aide or as a sewing machine operator and as a certified nurse's aide up until that date. One of the reasons why I was asking about the various doctors is because there is a special deference that's given to the treating physicians. And we have McKinney and Dr. Youngs were both clearly treating physicians. Now, how about Dr. Burke? He did the surgery, but did he do anything else other than just examine her? We only have these, as far as I know, two reports from him. And he did examine her at this point, but he doesn't give any specific limitations. He does say that her neurological examination is essentially normal, except for some slight slow indentation and some memory loss. And the memory loss was the main thrust in this argument, in this claim at first. And the ALJ, even though an ALJ is — even though a treating physician is normally given deference, an ALJ may reject a treating physician opinion by citing forth specific legitimate reasons. And Dr. — It's hard to see how a person would really be hired that has all these problems with memory loss, can't sit and stand for very much of the time, and has continual headaches. If you were an employer, would you really be wanting to employ somebody that has those limitations? But, Your Honor, that's not the standard by the regulations and the rules. And the — to address this issue, we actually had a — It's a nutsorter. As far as I know, it's contained in the DOT, the Dictionary of Occupational Titles. And — What do you do when you're — where do you sort these nuts? According to the vocational testimony, apparently you just — as nuts go by, you sort bad nuts from good nuts, as far as I can tell. And — Where? Oh, nuts from Fresno or wherever may happen to — I see that — There's a job. And we do rely on the testimony of the vocational expert in these situations. Well, I know. But I guess we're — vocational experts are experts, I suppose. But don't they have to show what kind of a job it is? I see that there are a lot of people apparently — Employed as a nutsorter, in fact. As a nutsorter. I just was curious if you know where they do this sorting of nuts. I'm not certain. But the vocational expert, we're relying on his testimony. Who does know these things? Yeah, nobody asked that question. Neither the claimant's attorney or the ALJ asked that question. How about a surveillance monitor? What is that? Apparently, you watch a monitor, which — Monitoring what? Monitoring what's happening, perhaps a building, after hours, security. Like a watchman? I would think so. From the description that the vocational expert gave. And that's a job where you can sit down and stand whenever you feel like it, according to the vocational expert testimony. And you don't have to have a good short-term memory, like who just came by, or whether if you're watching to surveil this building and you don't remember whether somebody just came by or not. The evidence doesn't show that there's that much in the way of limitations. In fact, the ALJ was basically relying on the decision or the report of Dr. Podell, who was a licensed psychologist, who definitely and specifically treated or evaluated the memory impairment. Did he consider the headache, the effect of the headaches, in addition? The headaches were not specifically discussed there or alleged by the claimant herself at that point. But she did also, as a psychologist, evaluate her mental condition so there was no behavior problems that would manifest themselves or would limit her ability to do simple work. I know I see these case after case with the vocational expert being wheeled in and says there's this, this, and this, without practically thinking how that's going to work. Like you take that surveillance monitor. Somebody is legitimately going to be hired that has a short-term memory, has headaches a lot of the time, can't sit and stand to follow somebody to see where they're going. I can't imagine how that person is really ever going to be hired as a surveillance monitor. Well, essentially the rules say that it's not the employability, which is the factor. The factor is whether the claimant has the ability to do these, has the exertional capability to do these jobs. Well, that's what an employer would be considering is whether the person can actually do the job. Yeah, but specifically employability as a factor is not a factor in these cases. By Congress, congressional mandate. Yes, okay. You're not trying to suggest they overwrite us. Well, I wouldn't do that. But you are, and you may be right. All right. Your time is up. We'll give you a minute on rebuttal. Judge Gibson, did you have any questions? No, no. Thank you. I just thought I'd point out that in Dr. Burke's report of January 18, 1994, here's page 152 that was referred to here, the claimant reported she had constant daily headaches that involved the right frontal occipital region, especially when she bends over, throbbing sensation. And Dr. Burke did mention that that was one of the diagnoses here, chronic daily headaches, sphenoid and ethnoid sinusitis. What was the evidence in the record that you're saying showed the effect on her performance? I mean, the government is arguing that, sure, she had the headaches, but they were there all along and she's been able to function. So what's new? Okay. Well, it goes to the state agency's evaluation. This is Dr. Golub's assessment. He said it could be just because of short-term memory loss here, but maybe it's because of the headache pain. He said that she had a moderate limitation with regards to the ability to concentrate for extended periods of time. That was what he indicated, as well as inability to respond to change of work settings here. That was what was left out of the hypothetical to the vocational expert. I want to point out that there was no specific finding in the credibility finding with regard to headache pain. She alleged two kinds of pain, the back pain and headache pain. The judge basically went into a lot of different reasons, but he never really identified what pain he was talking about, whether it was the back pain or the pain in the headache pain here. Which would be the treating physicians to whom deference is due? We would argue that deference should be given to the opinion of Dr. McKinney, maybe not so much with regards to Dr. Young's. He's not a specialist, and his reports were just assessments. He did not write an evaluation. But Dr. McKinney was very concerned about the case. He said that she was suffering from serious complications from the sinus surgery. It was in the notes that was recorded, actually, by Dr. Burke, where Dr. Burke said that Dr. McKinney had referred her to us because of increasing dementia. It was Dr. McKinney that was really concerned about her case and referred her back to the neurologist. Dr. Young didn't do that for some reason here, but Dr. McKinney was really concerned. It was that report. We consulted Dr. Burke. Dr. Burke didn't really say much. He just said she has some brain damage, she has brain atrophy or encephalomyelitis. Did he do deference as a treating physician? Yes, but he just didn't make a determination of disability. He didn't offer any opinions as to whether she could or could not work. He didn't say what her functional limitations were. He just basically thought that her condition had been stabilized, and there's nothing for him to do as a surgeon, and then he was just out of the picture. He just didn't offer an opinion. What I wanted to point out was in regards to sustaining You'll have to be quick because we're well over your time. Okay. The claimant had testified that she stopped her work as a nurse's aide because she said she couldn't remember her patients, couldn't remember what rooms they were in, she couldn't remember what she was supposed to do for them, that she had some serious memory problems here. And we contend that because of the fundamental ambiguities here, that the commissioner should be found to have failed to meet their burden. Step number five here, there was insufficient factual basis for reliance upon the grids, and that is also error.  Thank you. All right. Thank you. Counsel is thanked for their argument. The case that's argued will be submitted.
judges: Hug, Gibson, Fisher